IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| DONNA BERNER, | HONORABLE JEROME B. SIMANDLE |
| Plaintiff, | CIVIL NO. 08-3617 (JBS) |
| v. | |
| | **OPINION** |
| MICHAEL J. ASTRUE, COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | |
| Defendant. | |

APPEARANCES:


Robert A. Petruzzelli, Esq.
JACOBS, SCHWALBE & PETRUZZELLI, P.C.
Woodcrest Pavilion
Ten Melrose Ave., Suite 340
Cherry Hill, NJ 08003
    Attorney for Plaintiff

Ralph J. Marra, Jr.
ACTING UNITED STATES ATTORNEY
    By:  John M. Kelly
        Special Assistant United States Attorney
Social Security Administration
Office of the General Counsel
26 Federal Plaza, Suite 3904
New York, NY 10278
    Attorney for Defendant

**SIMANDLE**, District Judge:

    This matter comes before the Court pursuant to Section

205(g) of the Social Security Act ("the Act"), as amended, 42

U.S.C. § 405(g), to review the final decision of the

1

Commissioner of the Social Security Administration ("Defendant")
denying the application of Claimant Donna Berner ("Claimant") for
Disability Insurance Benefits ("DIB") under Title II of the Act.
See 42 U.S.C. §§ 401-34.  This Court must determine whether the
Administrative Law Judge's ("the ALJ") calculation of Claimant's
Residual Functional Capacity ("RFC"), and decision that Claimant
had the necessary RFC to perform her previous relevant work, is
supported by substantial evidence.

Claimant brings five challenges, arguing that the ALJ: (1)
used the incorrect onset date; (2) improperly discounted
Claimant's testimony of disabling pain and limitations; (3) erred
in evaluating Claimant's severe impairments at step two of the
sequential evaluation; (4) failed to properly evaluate and weigh
the medical evidence of record; and (5) failed to properly
determine Claimant's Residual Functional Capacity and ability to
perform prior work.  For the reasons set forth below, this Court
will affirm the decision of the Commissioner denying Claimant's
application for Disability Insurance Benefits.

## I.  BACKGROUND

Mrs. Berner was born on June 27, 1958, (R. at 281), and
currently lives in Cherry Hill, New Jersey.  (R. at 30.)  She
graduated from high school, is 5'8' tall, 160 pounds, and lives
with her husband and 15-year-old son.  (R. at 281-83.)

2

### A.    Procedural History

Claimant filed an initial application for DIB under the Act, which was denied on February 10, 2005.  This initial application, which alleged an onset date of June 20, 2002, was appealed to the United States District Court for the District of New Jersey, which affirmed the Commissioner's decision on December 1, 2006. See Berner v. Commissioner, 05-CV-4762 (RBK).  Claimant did not appeal this decision further.

Claimant protectively filed her current application for Disability Insurance on April 21, 2005, alleging disability since June 25, 2003.  (R. at 61.)  The application was denied initially and upon reconsideration.  (Id.)  A hearing was held on July 2, 2007, before ALJ Daniel W. Shoemaker, Jr.  (R. at 279-302.)  The ALJ issued a decision on September 10, 2007, denying Claimant entitlement to DIB benefits.  (R. at 11-12.)

Claimant filed a Request for Review by the Appeals Council, and the Appeals Council denied that request on June 19, 2008. (R. at 5-7.)  Therefore, the ALJ's denial became the final decision of the Commissioner, Defendant. (R. at 199, 245-47.)  On July 22, 2008, Claimant timely filed this action in this Court, seeking review of the Commissioner's determination.

**B. Administrative Law Judge Opinion**

The ALJ made the following findings after the hearing. First, the ALJ found that Claimant had not engaged in substantial gainful activity since February 11, 2005, the alleged onset date determined by the ALJ.  (R. at 16.)  Next, the ALJ found that Claimant suffered from the severe impairments of "fibromyalgia, chronic lower back pain syndrome, and arthritis of the knees." (Id.)  However, the ALJ did not find Claimant's mental impairments to be severe.  (Id.)

Next, the ALJ determined that none of these impairments or combination of these impairments met or exceeded the criteria of any of the listed impairments in 20 C.F.R., Part 404, Subpart P, Appendix 1.  (R. at 17.)  The ALJ proceeded to the following step of the evaluation, and determined that while Claimant's capacity to work was limited, she retained the capacity for "the full range of light work."[1]  (Id.)  The ALJ also determined that Claimant was capable of performing past relevant work as a cashier, which is light in exertional demands and semi-skilled in nature, (DOT § 211.462-014), and as a teachers' aide, which is

---

[1] The full range of light work requires an individual to lift up to 20 pounds at a time with frequent lifting or carrying up to 10 pounds, standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday, and sitting may occur intermittently during the remaining time.  SSR 83-10.

light in exertional demands and skilled in nature, (DOT §
099.327-010), according to the Dictionary of Occupational Titles.
(R. at 21.)  The ALJ determined that Claimant's past work as a
teachers' aide and a cashier did not require the performance of
work-related activities precluded by her residual functional
capacity.  Thus, Claimant, according to ALJ Shoemaker, was not
disabled during the relevant period of time, from February 11,
2005 until July 2, 2007, and not entitled to Disability Insurance
Benefits.

In reviewing the decision of the Administrative Law Judge,
this Court must determine: (1) which date serves as the proper
onset date; (2) whether the ALJ improperly disregarded Claimant's
complaints of disabling pain and limitations as not entirely
credible, in violation of SSR 96-7p; (3) whether Claimant's non-
exertional psychiatric impairments and chronic pain are
conditions that qualify as "severe" pursuant to SSR 96-3p; (4)
whether the ALJ properly determined Claimant's Residual
Functional Capacity and ability to perform prior relevant work;
and (5) whether the treating physician's opinions were afforded
the proper weight.

**C.  Evidence in the Record**

      1.  <u>Medical Records</u>

           a.  <u>Dr. Dwyer - Orthopedic Surgeon</u>

Dr. Thomas A. Dwyer was Claimant's treating orthopedic surgeon.  Dr. Dwyer performed two surgeries on Claimant's right knee; the first on July 27, 2003 and the second on November 29, 2004.  (R. at 134, 178.)  Dr. Dwyer met with Claimant after the second surgery on March 7, 2005 to perform an orthopaedic evaluation.  (R. at 202.)  After a physical examination, Dr. Dwyer assessed Claimant with symptomatic distal patellofemoral arthropathy[2] and right knee pain.  (<u>Id.</u>)  He recommended a conservative course of action, and injected the right knee with Xylocaine and Depo-Medrol.  (<u>Id.</u>)  Dr. Dwyer provided her with Glucosamine/Chondroitin Sulfate for her to take on a daily basis to help with her osteoarthritis ("OA").  (<u>Id.</u>)

Dr. Dwyer conducted a follow-up with Claimant regarding her second knee surgery on August 8, 2005, where his assessment was that Claimant had chondromalacia of the patella[3] on the right

_____

[2] An overuse syndrome of anterior knee pain associated with excessive lateral motion of the patella during activity. <u>Stedman's Medical Dictionary</u>, (27th ed. 2000)(Available on Westlaw).

[3] A softening of the articular cartilage of the patella; may cause patellalgia.  <u>Stedman's Medical Dictionary</u>, "chondromalacia of the patella" (27th ed. 2000)(Available on Westlaw).

knee.  (R. at 201.)  Dr. Dwyer stated that the only possible
treatment would be a Fulkerson Osteotomy,[4] which he believed her
symptoms did not justify. (Id.)

> b.  <u>Dr. Soloway - Treating Rheumatologist</u>

The record indicates that Dr. Stephen Soloway, Claimant's
treating rheumatologist, consistently saw and treated Claimant
from October 14, 2002 until February 14, 2007.  (R. at 242-73.)

On June 26, 2005, Claimant came to Dr. Soloway "complaining
of total body pain" which felt like a spasm, especially on the
left side of her neck.  (R. at 253.)  Claimant alleged difficulty
sleeping.  (Id.)  She stated her pain was worse in the evening
and worse with use of her muscles.  (Id.)  Dr. Soloway's notes
indicate that Claimant had lumbar disc disease, but she denied
further treatment other than therapy.  (Id.)  Dr. Soloway's
examination revealed multiple trigger points present throughout
and no synovitis[5] present in any of her joints.  (Id.)

---

[4] Cutting a bone, usually by means of a saw or osteotome.
<u>Stedman's Medical Dictionary</u>, "Fulkerson Osteotomy" (27th ed.
2000)(Available on Westlaw).

[5] Inflammation of a synovial membrane, especially that of a
joint; in general, when unqualified, the same as arthritis.
<u>Stedman's Medical Dictionary</u>, "synovitis" (27th ed.
2000)(Available on Westlaw).

Claimant's neurovascular[6] status was intact.  (Id.)  Dr. Soloway confirmed her fibromyalgia.  (Id.)  Dr. Soloway indicated that Claimant declined any trigger point injections.  (R. at 254.)  He restarted her on Elavil and started her on a trial of low dose Lexapro[7]; he also prescribed Flexeril[8] and Percocet[9] as needed. (Id.)  Dr. Soloway considered a second opinion regarding Claimant's fibromyalgia, or a trial dose of steroids if the flare did not resolve.  (Id.)

On August 15, 2005, Claimant came to Dr. Soloway complaining of neck pain that radiated down to her shoulders, hands and wrist.  (R. at 249.)  Dr. Soloway found pain with the flexion extension of the cervical spine with paracervical spasm, and some tenderness over the facet joints and other superficial surfaces. (Id.)  He also found her neurovascular status intact.  (Id.)  Dr.

---

[6] Relating to both nervous and vascular systems; relating to the nerves supplying the walls of the blood vessels, the vasomotor nerves.  Stedman's Medical Dictionary, "neurovascular" (27th ed. 2000)(Available on Westlaw).

[7] Lexapro is indicated for the treatment of major depressive disorder.  Physicians' Desk Reference, 1176 (62d ed. 2007).

[8] Flexeril is indicated for non-neurogenic acute muscle spasm as adjunct to rest and physical therapy.  McNeil Consumer and Specialty Pharmaceuticals Monthly Prescribing Reference (2008).

[9] Percocet is indicated for the relief of moderate to moderately severe pain.  Physicians' Desk Reference, 2463 (62d ed. 2007).

Dwyer prescribed OxyContin.  (Id.)  When Claimant came in on September 7, 2005, the CT scan revealed that Claimant had right side bone spurs, and the C-spine and x-ray was normal.  (R. at 247.)  Dr. Soloway recommended an EMG and nerve conduction study of Claimant's upper extremities, and prescribed MS Contin and Percocet.  (Id.)

After a followup on October 10, 2005, Dr. Soloway's impression was that Claimant had chronic pain.  (Id.) Dr. Soloway indicated that Claimant walked with an antalgic gait,[10] (R. at 246), and some discomfort with range of motion, predominantly with right-side low back pain.  (Id.)  Otherwise, the gross neurovascular status was intact.  (Id.)  Claimant had not done well with OxyContin in the past, therefore Dr. Soloway prescribed Fentanyl and Duragesic patch[11] in addition to Percocet to manage the pain.  (Id.)  These new medications were in

_____

[10] A characteristic gait resulting from pain on weightbearing in which the stance phase of gait is shortened on the affected side. Stedman's Medical Dictionary, (27th ed. 2000)(Available on Westlaw).

[11] Fentanyl and Duragsic Patches are indicated for management of persistent, moderate to severe chronic pain that requires continuous, arund-the-clock opiod administration for an extended period of time, and cannot be managed by other means such as non-steroidal analgesics, opioid combination products, or immediate-release opioids. Physicians' Desk Reference, 2353 (62d ed. 2007).

addition to the Neurontin,[12] Mobic,[13] Sonata,[14] Xanax,[15] Imitrex,[16] Lexapro and Flexeril that Claimant was also taking.  (Id.)

On November 1, 2005, Claimant came to Dr. Soloway for a followup appointment.  (R. at 245.)  Claimant said that she had improved, but was not one hundred percent recovered.  (Id.)  Dr. Soloway stated that she declined treatment for her lumbar disc disease, and was there for her fibromyalgia.  (Id.)  The physical exam revealed trigger points present throughout, mostly in upper extremities.  (Id.)  The lumbar spine range of motion had decreased, likely due to paravertebral spasm.  (Id.)  The EMG of the upper extremities was normal.  (Id.)  Claimant continued using Neurontin, Mobic, Sonata, Xanax, Percocet, Imitrex, Lexapro, Flexeril and Duragesic patch.  (Id.)

---

[12] Neurontin is indicated for the management of postherpetic neuralgia in adults.  Physicians' Desk Reference, 2463 (62d ed. 2007).

[13] Mobic is indicated for relief of the signs and symptoms of osteoarthritis and rheumatoid arthritis.  Physicians' Desk Reference, 857 (62d ed. 2007).

[14] Sonata is indicated for short-term treatment of insomnia. Physicians' Desk Reference, 1754 (62d ed. 2007).

[15] Xanax is indicated for the management of anxiety disorders or the short-term relief of symptoms of anxiety. Physicians' Desk Reference, 2256 (48th ed.).

[16] Imitrex tablets are indicated for the acute treatment of migraine attacks with or without aura.  Physicians' Desk Reference, 1469 (62d ed. 2007).

Claimant had another followup on November 29, 2005, and Dr. Soloway reported that she was doing well with her current regime. (R. at 244.)  Claimant had a followup on January 3, 2006 where Dr. Soloway reported no current change, and that Claimant was doing well on her regimen.  (R. at 243.)

Claimant's last documented visit with Dr. Soloway took place on February 14, 2007.  (R. at 273.)  At that point, she was known to have fibromyalgia, osteoarthritis of the knees, and lumbar disc disease controlled through a pain management program.  (Id.) Claimant came in for a followup visit and her lab results.  (Id.) Claimant stated that she continued to have pain radiating down her right leg, which was worse from her lower back.  (Id.)  Upon examination, Dr. Soloway stated that there was pain with range of motion of the lumbar spine, radiating down to her mid thigh level, and her neurovascular status was intact.  (Id.)  Dr. Soloway advised Claimant to continue with pain management, psychiatric and neurological treatment, therapy and assistive devices.  (R. at 274.)

### c.  Dr. Hugh D. Moore - Psychiatrist

Claimant visited Dr. Hugh D. Moore, a psychiatrist, on August 18, 2005.  (R. at 215.)  Claimant alleged that she had difficulty sleeping and woke up several times nightly.  (Id.)

11

Claimant stated her appetite was normal, but that she had a
decrease in sexual functioning.  (Id.)  Claimant again said that
she experienced the above-mentioned symptoms of depression and
panic attacks, which she believed were triggered by bouts of
pain.  (R. at 215-16.)  Claimant reported that within the limits
of her pain and difficulty staying in one position too long, she
was able to cook and perform other household chores.  (Id.)  She
was able to drive, and Claimant reported that she was able to
manage money.  (Id.)  Dr. Moore reported that Claimant:

> appeared to be capable of understanding and following
> simple instructions and directions, performing simple
> and complex tasks both with supervision and
> independently, maintaining attention and concentration
> for tasks, attending to a routine and maintaining a
> schedule, learning new tasks, making appropriate
> decisions and relating to and interacting appropriately
> with others.

(Id.)  Dr. Moore believed that the vocational difficulties were
caused primarily by medical problems.  (Id.)

Dr. Moore expressed that the results of the examination
appeared to be consistent with psychiatric problems, but the
psychiatric problems themselves did not appear significant enough
to interfere with Claimant's ability to function on a daily
basis.  (Id.)  Dr. Moore concluded that Claimant's prognosis was
fair if she followed through with her formal treatment to deal
with psychiatric symptoms and if she continued with intervention

and support.  (R. at 218.)

        d.  <u>Dr. Nithyashuba Khona - Orthopedic</u>
             <u>Examination</u>

    Claimant met with Consultative Physician Nithyashuba Khona
on July 14, 2005.  (R. at 195.)  Claimant expressed that she had
pain in her back, lumbar disk disease with herniation and hyper
mobility, could not bend and could not generally do things, which
caused her depression.  (<u>Id.</u>)  She said she tended to stay home
in her room, cry, and feel useless and helpless.  (<u>Id.</u>)  Claimant
stated that she was seeing a psychiatrist.  (<u>Id.</u>)  She complained
of having fibromyalgia for three years.  (<u>Id.</u>)  She had
generalized aches and pains all over the body, and her body felt
as if she had the flu.  (<u>Id.</u>)  She also had right knee pain, and
had been wearing a brace for the past year.  (<u>Id.</u>)  Claimant
rated the pain in her knee in the range of seven out of ten.
(<u>Id.</u>)  Claimant stated she had sleeping problems and was always
tired.  (<u>Id.</u>)  Claimant complained of segmental dysfunction of
the cervical spine, and that she was seeing a chiropractor for
her back and neck pain.  (<u>Id.</u>)

    Claimant said that she cooks occasionally, does laundry once
a week, goes shopping once a month with her husband and attends
to childcare daily.  (R. at 196.)  Claimant showers and dresses
daily.  (<u>Id.</u>)  Claimant said she does not clean because she

cannot bend, and she cannot get in and out of the tub.  (Id.)

Claimant did not appear to be in acute distress.  (Id.)  She walked with a slight limp, and was wearing poor footwear and a knee brace on the right.  (Id.)  Claimant was not able to squat. (Id.)  Claimant did not use any assistive device, and needed no help changing for the exam or getting on and off the exam table. (R. at 197.)  She also rose from the chair without difficulty. (Id.)

Dr. Khona's examination revealed no cervical or paracervical pain or spasm, and no trigger points.  (Id.)  Claimant was able to forward elevate her shoulders ninety degrees, but then stated she was unable to do any other activities because it pulled on her back.  (Id.)  She declined to do external rotation or internal rotation.  (Id.)  Abduction was ninety degrees bilaterally and adduction was thirty degrees bilaterally.  (Id.) However in these two movements when the examiner tried to examine, the examiner was able to achieve more than 140 degrees movement.  (Id.)  For the external rotation, Dr. Khona was not successful because Claimant was resistant and complained of pain. (Id.)  Claimant had a full range of bilateral motion of elbows, forearms, wrists and fingers.  (Id.)  Claimant had no joint inflammation, effusion, or instability, and strength was five out

of five in the proximal and distal muscles.  (Id.)  There was no muscle atrophy or sensory abnormality.  (Id.)  She had generalized spine and paraspinal tenderness from head to toe, but no sacroiliac joint or sciatic notch tenderness.  (Id.)

Claimant had a full range of motion of the hips, knees, and ankles bilaterally.  (Id.)  Strength was rated five out of five in the proximal and distal muscles bilaterally, and there was no muscle atrophy or sensory abnormality.  (Id.)  An x-ray of the lumbar spine revealed moderate disc space narrowing in the lower two levels.  (R. at 198.)

Dr. Khona found that Claimant had mild limitations for bending and squatting because of the knee pain, but otherwise, no remarkable findings.  (Id.)  Dr. Khona said Claimant required a pain management program for her complaints of back and knee pain.  (Id.)  Dr. Khona diagnosed Claimant with fibromyalgia, chronic pain, patellofemoral arthropathy, and generalized degenerative joint disease of the cervical and lumbar spine.  (Id.)

     e.  Disability Determination Services Physicians

The Disability Determination Services ("DDS") Physician, Dr. W. Skranovski, completed a Psychiatric Review Technique Form for Claimant on August 24, 2005.  (R. at 228-41.)  Dr. Skranovski did not find Claimant's mental impairments to be severe.  (R. at

228.)  Based on Claimant's mental impairments, Dr. Skranovski
found no restriction of activities of daily living, no
difficulties in maintaining social functioning, no difficulties
in maintaining concentration, persistence or pace, and no
repeated episodes of deterioration.  (R. at 238.)  Dr. Skranovski
reported that Claimant was able to memorize and carry out tasks,
interact socially in a work setting and adapt to challenges.  (R.
at 240.)

A Physical Residual Functional Capacity Assessment was
prepared by DDS physician E. Barasch on August 31, 2005, based on
Dr. Khona's evaluation.  (R. at 220.)  Dr. Barasch reported that
Claimant was capable of lifting twenty pounds occasionally and
ten pounds frequently.  (Id.)  Claimant could stand and/or walk
for a total of about six hours in an eight hour workday.  (Id.)
Claimant could sit for a total of about six hours in a normal
eight hour workday.  (Id.)  Claimant had no restrictions on
pushing or pulling.  (Id.)  Claimant could balance, stoop, kneel,
crouch or crawl occasionally.  (Id.)  Claimant had no
manipulative, visual, communicative, or environmental
limitations.  (Id.)

There was no treating medical source opinion available from
Claimant's own treating physician for this assessment, and it was

based solely on the objective medical findings submitted by Dr. Nithyashuba Khona.  (Id.)

A second DDS physician, Dr. Melvin L. Golish, reviewed the findings on March 3, 2006.  (R. at 225.)  Dr. Golish included a few notes based on five medical reports conducted by physicians other than Dr. Khona, and affirmed the prior RFC rating without further explanation.  (Id.)

### f.  Claimant's Testimony

Claimant testified that she has a drivers license, but drives only as necessary, approximately three times a week, because stepping on the gas hurts her knees and lower back.  (R. at 283.)  Claimant testified that her husband had driven her to the ALJ hearings.  (R. at 284.)  Moreover, she's afraid to be alone because if she has a back spasm, an entire side of her body can go numb and she is unable to walk.  (Id.)

Claimant testified that she stopped teaching in June, 2003, because it was very hard on her lower back, due to the constant bending and stooping over students desks.  (Id.)  Before becoming a teacher's aide in 1990, (R. at 95), Claimant stated that she was a cashier, where she made sandwiches, worked with the money, scrubbed floors and pumped gas.  (R. at 285.)  Claimant testified that she received training to be a teacher's aide after she began

to work as an aide in Fairfield Township.  (Id.)  Claimant worked with special education students and other students who needed further assistance with their class work in grades first through fourth.  (R. at 287.)

Claimant stated that her mental impairments interfered with her work, and she believed it was "not fair" to be with the children as a teachers' aide given her "bouts of depression" and her tendency to "forget[] a lot of things."  (Id.)  Claimant stated, "you have to be of a good spirit, of a good heart to help children and I have some, a lot of days that I just don't even want to get out of bed because I just don't feel like it's worth me getting out of bed."  (Id.)  In Claimant's disability report form, she also wrote that she often can't remember certain things that she has done and is "sleepy and groggy" because of the medication that she is on.  (R. at 68, 70, 72, 73, 75.)

Claimant testified that she was seeing a pain management specialist, Dr. Antebie, every month.  (R. at 290.)  Dr. Antebie gives Claimant either medication or injections in the back depending on how severe the pain is on the particular day.  As far as Claimant's pain is concerned, Claimant testified,

> When I'm walking or I'm standing up or I have to reach
> and get something off the floor just bending down to
> reach something on the floor it goes on my right side
> up over my waist and all the way down below my waist

> through my knee and it just paralyzes my body on that
> side and then . . . It's pain where I can't even walk
> or move, I'm just doubled over . . .

(R. at 291.)  Claimant went on further to say that the pain feels
"like somebody sticking a fist or a knife into your back and then
your leg doesn't work anymore."  (Id.)  Claimant explained that
she could do household chores a little in a roller chair, and
even at that only for a couple of minutes.  (R. at 292.)
She testified that she also sees Dr. Tugman for severe migraines,
which she experiences approximately three times a month, (R. at
298), and for yearly check-ups.  (R. at 290.)

Claimant got a back cramp during the ALJ hearing, and had to
get up, walk around and try to stretch it out.  (Id.)  Claimant
said the cramps generally lasted about a minute or so, and that
she expected to get more cramps within about twenty minutes.  (R.
at 293.)  Claimant testified that after five or ten minutes of
standing, she starts to hurt, and that when walking she can get
severe spasms that cause her leg to give out.  (R. at 293-94.)

Claimant said that when she has fibromyalgia flares, both
shoulders, under her ribs, elbows and joints hurt and "the weight
of [her] own body laying in bed at nighttime" keeps her awake.
(R. at 294.)  Claimant later went on to say, "[i]f I lay on my
left side for fifteen minutes my hips hurt so bad on my own

skin," that she must turn over.  (R. at 300.)

Claimant testified that she gets depressive symptoms even when not experiencing increased physical pain.  (R. at 296.)  She stated that she never wants to go out, especially on her own. (Id.)  Claimant testified that she gets depressed when she sees the chores she should have been doing and knows she cannot do them.  (Id.)  Claimant wrote in her disability insurance report that she "used to make big meals for [her] family, now [she] can't even help with Thanksgiving dinner."  (R. at 68.)  She said that it "hurts your heart . . . not to be able to be the wife and the mom that you want to be, that you used to be."  (R. at 296.)

Claimant said that her depression makes her head all jumbled up and she does not want to think about anything.  (R. at 297.) Instead she goes to her room, cries and is scared because she never knows when the spasms are going to happen again.  (R. at 297.)  Claimant testified that when her back goes out, because of the medications she is taking, she cannot go to the bathroom for up to four days at a time.  (Id.)  Sometimes Claimant sits on the toilet so long that her legs go to sleep.  (Id.)  Claimant has her husband or daughter watch her when she gets in and out of the shower, because she has previously fallen.  (Id.)  Claimant testified that she sometimes uses a cane, but that she is

20

embarrassed by it.  (Id.)

Claimant stated that she used to go out to play Bingo about three times a week, but has not recently because the last two times she went she had spasms that caused her leg to give out. (R. at 70, 299.)  Claimant wrote in her disability insurance report that she also used to swim, bike ride, cook, clean, shop for food and clothing, go on school trips with her children, exercise, dance, run, walk and stand, but can do none of these activities anymore.  (R. at 67, 70.)  Claimant additionally wrote that even if she does small things like go to play Bingo, the next day her "arms feel like they're sprained," and she has to "wrap it up and not use it for one or two days and it just aches and hurts as if it were broke [sic]."  (Id.)  The same sensations apply to her legs and ankles.  (Id.)  Claimant closed by saying "I'd love to go to work.  I didn't even want to quit my work, job when I did quit but I had to because I couldn't help the kids, I couldn't help myself."  (R. at 301.)

## II.  DISCUSSION

### A.  Disability Defined

The Social Security Act defines "disability," for purposes of an individual's entitlement to DIB, as the inability "to engage in any substantial gainful activity by reason of any

21

medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A). Under this definition, a claimant qualifies as disabled

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has promulgated regulations that determine disability by application of a five-step sequential analysis codified in 20 C.F.R. § 404.1520. The Commissioner evaluates each case, step-by-step, until a finding of "disabled" or "not disabled" is obtained. 20 C.F.R. § 404.1520(a). The five-step process is summarized as follows:

> 1. If the claimant currently is engaged in substantial gainful employment, the claimant is "not disabled."

> 2. If the claimant does not suffer from a "severe impairment," the claimant is "not disabled."

> 3. If the severe impairment meets or equals a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1 and has lasted or is expected to last for a continuous period of at least twelve months, the claimant is

22

"disabled."

4. If the claimant can still perform work the claimant has done in the past ("past relevant work"), despite the severe impairment, the claimant is "not disabled."

5. Finally, the Commissioner will consider the claimant's ability to perform work ("residual functional capacity"), age, education and past work experience to determine whether or not the claimant is capable of performing other work which exists in the national economy. If the claimant is incapable, a finding of disability will be entered. On the other hand, if the claimant can perform other work, the claimant will be found not to be disabled.

See 20 C.F.R. § 404.1520(b)-(f).

This analysis involves a shifting burden of proof. Wallace v. Sec'y of Health & Human Servs., 722 F.2d 1150, 1153 (3d Cir. 1983). In the first four steps of the analysis, the burden is on the claimant to prove every element of her claim by a preponderance of the evidence. In the final step, however, the Commissioner bears the burden of proving that work is available for the petitioner: "Once a claimant has proved that he is unable to perform his former job, the burden shifts to the Commissioner to prove that there is some other kind of substantial gainful employment he is able to perform." Kangas v. Bowen, 823 F.2d 775,777 (2d Cir. 1987).

**B.   Standard of Review**

A reviewing court must uphold the Commissioner's factual

decisions if they are supported by "substantial evidence."  42

U.S.C.A §§ 405(g), 1383(c)(3); <u>Williams v. Sullivan</u>, 970 F.2d

1178, 1182 (3d Cir. 1992), <u>cert. denied</u>, 507 U.S. 924 (1993).

"Substantial evidence" means more than "a mere scintilla."

<u>Metropolitan Stevedore Co. V. Rambo</u>, 521 U.S. 121, 149

(1997)(<u>quoting</u> <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229

(1938)).  "It means such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion." <u>Id.</u>  The

inquiry is not whether the reviewing court would have made the

same determination, but, rather, whether the Commissioner's

conclusion was reasonable.  <u>See</u> <u>Brown v. Bowen</u>, 845 F.2d 1211,

1213.  Thus, substantial evidence may be slightly less than a

preponderance.  <u>See</u> <u>Hanusiewicz v. Bowen</u>, 678 F. Supp. 474, 476

(D.N.J. 1988).  Some types of evidence will not be "substantial."

For example,

> [a] single piece of evidence will not satisfy the
> substantiality test if the [Commissioner] ignores, or
> fails to resolve, a conflict created by countervailing
> evidence.  Nor is evidence substantial if it is
> overwhelmed by other evidence - particularly certain
> types of evidence (e.g. that offered by treating
> physicians) - or if it really constitutes not evidence
> but mere conclusion.

<u>Wallace v. Sec'y of Health and Human Servs.</u>, 722 F.2d 1150, 1153

(3d Cir. 1983) (<u>citing</u> <u>Kent v. Schweiker</u>, 710 F.2d 110, 114 (3d

Cir. 1983)).  The reviewing court, however, does have a duty to

review the evidence in its totality.  See Daring v. Heckler, 727 F.2d 64, 70 (3d Cir. 1984).  In order to do so, "a court must 'take into account whatever in the record fairly detracts from its weight.'" Schonewolf v. Callahan, 972 F. Supp. 277, 284 (D.N.J. 1997)(quoting Willbanks v. Sec'y of Health & Human Servs., 847 F.2d 301, 303 (6th Cir. 1988)).  The Commissioner has a corresponding duty to facilitate the court's review: "Where the [Commissioner] is faced with conflicting evidence, he must adequately explain in the record his reasons for rejecting or discrediting competent evidence." Ogden v. Bowen, 677 F. Supp. 273, 278 (M.D. Pa. 1987)(citing Brewster v. Heckler, 786 F.2d 581 (3d Cir. 1986))See also Adorno v. Shalala, 40 F.3d 43 (3d Cir. 1994).  As the Third Circuit has held, access to the Commissioner's reasoning is indeed essential to a meaningful court review:

> Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.

Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978).

Nevertheless, the district court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-

finder." Williams, 970 F.2d at 1182.

Moreover, apart from the substantial evidence inquiry, a reviewing court is entitled to satisfy itself that the Commissioner arrived at her decision by application of the proper legal standards. Friedberg v. Schweiker, 721 F.2d 445, 447 (3d Cir. 1983); Curtin v. Harris, 508 F. Supp. 791, 793 (D.N.J. 1981).

### C.   Analysis

The Court begins with the determination of the proper onset date for the purposes of Claimant's current disability insurance claim.  The onset date of disability is the first day an individual is disabled as defined in the Act and the regulations. SSR 83-20.  Factors relevant to the determination of disability onset include the individual's allegation, the work history, and the medical evidence.  Id.  These factors are often evaluated together to arrive at the onset date.  Id.  While Claimant alleged an earlier onset date of June 25, 2003, she was previously adjudged not disabled for the period of June 25, 2003 through February 11, 2005.  Therefore, the ALJ properly determined Claimant's onset date for the purposes of the present disability insurance claim determination as February 11, 2005, the day after the prior application was denied by an ALJ decision

dated February 10, 2005.

Claimant properly contends that a decision may be reopened within four years of the date of the notice of the initial determination if the Court finds good cause.  20 C.F.R. § 404.988.  Good cause is defined as (1) new and material evidence is furnished; (2) clerical error in the computation or recomputation of benefits was made; or (3) the evidence that was considered in making the determination or decision clearly shows on its face that an error was made.  20 C.F.R. § 404.989.  However, a Court will not find good cause to reopen a case if the only reason for reopening is a change of legal interpretation or administrative ruling upon which the determination or decision was made.  Id.

Claimant's counsel is also correct that during the hearing on July 7, 2007, the ALJ indicated that if new and material evidence was found, the prior application could be reopened because the initial denial was within the four years of the filing of the instant application.  (R. at 281.)  New evidence is that which was not available to the ALJ at the prior proceedings.  Benko v. Schweiker, 551 F. Supp. 698, 702 (D.N.H. 1982.)  Thus, introduction of evidence that is merely cumulative is precluded as a basis for reopening.  Id.

27

As the district court determined in <u>Koontz v. Heckler</u>, the
lack of documentation on the record of the prior denials, as well
as the reasons for those denials, make it difficult to determine
whether or not Claimant provided 'new and material evidence.'"
<u>Koontz v. Heckler</u>, No. 83-4382, 1985 U.S. Dist. LEXIS 13550, at
*11 (E.D. Pa. Nov. 28, 1985).  The district court held in that
case, that there was no new and material evidence, since the
record did not substantiate its existence one way or another.
<u>Koontz</u>, 1985 U.S.Dist. LEXIS 13550, at *12.  Likewise, here the
Court does not know what information in the record was previously
available, and Claimant has not presented any information
indicating the existence of new and material evidence that would
warrant the reopening of the prior proceedings.  The Court
therefore holds that there was no showing of good cause to reopen
the prior disability insurance application.  Thus, the relevant
period to examine for the determination of Claimant's disability
status is from the onset date of February 11, 2005 until the ALJ
hearing on July 7, 2007.

2.   <u>Credibility Determination</u>

Claimant argues that the ALJ's finding "that the
[C]laimant's statements concerning the intensity, persistence and
limiting effects of [her] symptoms [were] not entirely credible,"

28

(R. at 20), was not consistent with SSR 96-7p.[17]   The Court,
however, finds the ALJ's determination of Claimant's credibility
to be supported by substantial evidence, and declines to reverse
on this point.

_____

[17] In order to evaluate pain, SSR 96-7p states that:

First – The adjudicator must consider whether there is a
underlying medically determinable physical or mental
impairment that could reasonably be expected to produce the
individual's pain and other symptoms . . .

Second – The adjudicator must evaluate the intensity, the
persistence and limiting effects of the symptoms to determine
the extent to which the symptoms limit the individual's
ability to do basic work-related activities.  To do this, the
adjudicator must determine the credibility of the individual's
statements based on the entire case record.  An individual's
symptoms, including pain, will be determined to diminish his
capacity for basic work-related activities if the alleged
functional limitations and restrictions due to the symptoms
are consistent with the objective medical evidence and other
evidence in the case record.  In addition to the medical
evidence, the adjudicator must consider the individual's daily
activities; the duration, location, frequently and intensity
of the symptom; factors that precipitate and aggravate the
symptoms; type, dosage, side effects and, effectiveness of
medication; and other treatment or other measures taken to
relieve the pain or other symptoms.

Third – When the evaluator has determined the extent of
limitations, he must then consider the impact of the symptoms
of the individual's ability to function as well as the
objective medical evidence and other evidence at each step in
the sequential evaluation process…

The decision must contain specific reasons for the credibility
finding, supported by evidence in the case record and must
specifically state the weight given to the individual's
statements

The Third Circuit has held that "[a]n ALJ must give serious consideration to a claimant's subjective complaints of pain, even where those complaints are not supported by objective evidence." Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir. 1993)(citing Cotter v. Harris, 642 F.2d 700, 707 (3d Cir. 1981). Additionally, "[w]hile there must be objective evidence of some condition that could reasonably produce pain, there need not be objective evidence of the pain itself." Id. (citing Green v. Schweiker, 749 F.2d 1066 at 1071 (3d Cir. 1984)).  Moreover, "[w]here medical evidence does support a claimant's complaints of pain, the complaints should then be given 'great weight' and may not be disregarded unless there exists contrary medical evidence." Mason, 994 F.2d at 1066; see Carter, 834 F.2d at 65; Ferguson, 765 F.2d at 37; Taybron v. Harris, 667 F.2d 412, 415 n.6 (3d Cir. 1981).

However, the ALJ has discretion "to evaluate the credibility of a claimant and to arrive at an independent judgment in light of medical rulings and other evidence regarding the true extent of the pain alleged by claimant." Brown v. Schweiker, 562 F. Supp. 284, 287 (E.D. Pa. 1983).  "[D]istrict courts defer to an ALJ's determinations of credibility, refusing to substitute their own judgment for that of the ALJ, precisely because the ALJ has

the opportunity to observe the plaintiff first hand." McCarthy
v. Commissioner of Social Sec., No. 95-4534, 1999 WL 325017, at
*19 (D.N.J. May 19, 1999); see Wier v. Heckler, 734 F.2d 955, 962
(3d Cir. 1984.)  Therefore, "[e]ven if the Court would have
decided the case differently, it must accord deference to the
Commissioner and affirm the findings and decision if supported by
substantial evidence." Monsour Medical Center v. Heckler, 806
F.2d 1185, 1190-91 (3d Cir. 1986.)  Generally, great deference
must be given to the ALJ's determination of credibility.  See
Wier, 734 F.2d at 962.

        The Court will not reverse the ALJ's determination that
Claimant's testimony, regarding the extent and limiting
effects of her pain, was "not entirely credible."  The ALJ
noted that Claimant's testimony as to her functional
limitations during the time period at issue did not seem
credible because her testimony was "vague" and "somewhat
evasive".  (R. at 20.)  Credibility determinations such as
these are "better made by an ALJ, who has the expertise and
background necessary to properly evaluat[e] Social Security
Claimants." McCarthy, 1999 WL 325017, at *19; see Weir, 734
F.2d at 962.  Therefore, this Court will adhere to the ALJ's
conclusion that Claimant's testimony was "vague" and

"somewhat evasive".

The ALJ did not rely solely on his conclusions that the testimony was vague or evasive, but also discussed Claimant's refusal of treatment for her degenerative disc disease.  The ALJ acknowledged that "although the claimant experienced pain, th[r]ough January 2007, she continuously denied treatment for degenerative disc disease, other than brief chiropractic manipulation in 200[5]."  (R. at 20-21.)  An ALJ's consideration of the fact that a Claimant has not sought medical treatment for pain can be part of the basis for a valid credibility determination.  Mason v. Shalala, 994 F.2d 1058, 1069 (3d Cir. 1992).  The ALJ was right in noting Claimant's refusal of treatment for her lower back pain as evidence supporting his conclusion that Claimant's testimony as to disabling pain was not consistent with her objective actions.

Additionally, the ALJ explained that Claimant's testimony "seemed exaggerated considering the objective medical findings of record."  (R. at 20.)  This finding is similarly supported by substantial evidence.  Claimant's treating physician, Dr. Soloway, observed that Claimant "reported symptom improvement with her current medication regimen, though she was not at '100 percent.'"  (R. at 245.)  She continued to do well in her

treatment regime.  (R. at 243.)  Similarly, Dr. Khona found
Claimant to have only mild physical limitations.  (R. at 198.)
The objective medical evidence does suggest that Claimant's
limitations were less severe than she claimed.

Furthermore, the ALJ relied on reports from two additional
physicians, Dr. Khona and Dr. Moore, to support his assertion
that Claimant's testimony "was inconsistent with the much higher
level of daily activities indicated."  Id.  Dr. Khona's report,
from July 2005, stated that "Claimant cooks occasionally; does
her laundry once a week; shops twice a month with her husband;
performs daily childcare; and tends to her personal needs daily."
(R. at 196.)  Dr. Moore's medical report from August 18, 2005,
cited by the ALJ, stated that Claimant "tends to her personal
needs; cook[s] and perform[s] household chores; drive[s];
manage[s] money" and "get[s] along with friends and family."  Id.
Claimant also stated that "she spen[t] her days doing chores,
reading, watching television, and listening to the radio."  (R.
at 215.)

The fact that these two reports indicate that Claimant was
unable to do certain additional activities on account of her pain
and discomfort, as Claimant points out, does not detract from the
objective medical evidence in the record that supports her

ability to do the above activities.  Therefore, while this Court
might have interpreted the evidence in the record differently, it
cannot find that the ALJ abused his discretion in finding
Plaintiff's statements regarding her alleged disability to be
exaggerated, where that finding is supported by substantial
evidence.  Thus, the ALJ's determination of Claimant's
credibility stands.

          3.   Whether the ALJ Erred in Evaluating
               Claimant's Severe Impairments

     Claimant claims that the ALJ improperly evaluated her mental
impairments and severe pain as not amounting to "severe
impairments" as defined by 20 C.F.R. § 404.1520.  However, the
Court finds that there is substantial evidence to support the
ALJ's determination that Claimant's mental impairments did not
constitute a "severe impairment."  Additionally, the ALJ did
consider Claimant's pain to be severe.

     The analysis regarding whether an impairment is "severe"
takes place at Step Two of the Sequential Evaluation for the
evaluation of Claimant's disability.  20 C.F.R. § 404.1520.  This
step may do no more than screen out de minimis claims.  Brown v.
Yuckert, 482 U.S. 137, 153-54 (1987).  An impairment will not be
severe when it is a slight abnormality or combination of slight
abnormalities that have no more than a slight effect on the

34

ability to do basic work activities.  SSR 96-3p.  Basic work
activities are defined as "the abilities and aptitudes necessary
to do most jobs".  20 C.F.R. § 404.1521(b).  It is the ALJ's duty
to analyze all of the evidence in the Record and provide an
adequate explanation for disregarding evidence.  <u>Brewster v.
Heckler</u>, 786 F.2d 581, 584 (3d Cir. 1986); <u>Cotter v. Harris</u>, 642
F.2d 700 (3d Cir. 1981).

In light of the record as a whole, there is substantial
evidence to support the ALJ's finding that Claimant's mental
impairments did not constitute a severe impairment pursuant to 20
C.F.R. § 404.1520.  The ALJ correctly declined to discuss Dr.
Brown's consultative report because it was only relevant to the
period of time concerning Claimant's prior disability insurance
determination.  Based on the remaining relevant evidence in the
record, "more than a mere scintila" of evidence exists to support
the ALJ's conclusion.

The ALJ noted Dr. Moore's report that stated, "Claimant's
mood was anxious, and she appeared tense and apprehensive during
the examination."  (R. at 217.)  However these observations are
outweighed by other observations, some from the same report,
concerning all that Claimant was capable of doing.  Dr. Moore
stated that Claimant noted improvement of her depressive symptoms

with medication.  (R. at 216.)  Dr. Moore further observed that Claimant's psychiatric difficulties did not significantly interfere with her vocational skills, which supported the notion that Claimant's mental impairments were not severe.  (R. at 217.) This conclusion was echoed by Dr. Stranovski's evaluation finding no severe psychiatric limitations.  (R. 228-41.)  The evidence in the record more than adequately support's the ALJ's finding that Claimant's psychological difficulties were not severe.

Finally, and contrary to Claimant's objections, the ALJ did find Claimant's pain to be severe.  While the ALJ did not address Claimant's chronic pain specifically, he did determine that Claimant had severe fibromyalgia[18], severe chronic low back pain and severe arthritis of the knees.  (R. at 16.)  The classification of these three conditions as severe is consistent with the substantial evidence in the record and shows that the ALJ properly considered Claimant's pain and found it to be severe.

4.   Claimant's Residual Functional Capacity

Claimant argues that the ALJ failed to properly calculate her residual functional capacity and ability to perform prior

---

[18] Fibromyalgia is also known as myofascial pain syndrome. See The Merck Manual of Diagnosis and Therapy 481 (Mark H. Beers, M.D., and Robert Berkow, M.D. eds., 17th ed. 1999).

relevant work as performed in the national economy.  However, after reviewing the record as a whole, the Court finds that substantial evidence exists to support the ALJ's RFC determination and findings regarding Claimant's ability to perform prior relevant work experience.  The Court therefore declines to remand on these issues.

The sequential evaluation process for determining disability requires an assessment of the Claimant's functional limitations and her remaining capacities for work-related activities, referred to as the Claimant's residual functional capacity.  See SSR 96-8P.  A claimant's RFC represents her maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis.  Id.  The RFC assessment is a function-by-function assessment based upon the relevant evidence of the claimant's ability to do work-related activities.  Id.  A function-by-function assessment includes an assessment of a Claimant's physical abilities, mental abilities, and any other abilities affected by her impairments and how limitations regarding those abilities may affect her ability to do work on a regular and continuing basis.  20 C.F.R. §§ 416.945(b)(c)(d), 404.1545(b)(c)(d).  The assessment must include a narrative discussion describing how the evidence supports each

conclusion, citing specific medical facts and non-medical evidence.  Id.

The assessment of the claimant's RFC is used at Steps Four and Five of the Sequential Evaluation process to determine whether the Claimant is able to do past relevant work or other work which exists in the national economy.  Id.  The ALJ must consider all relevant evidence when determining an individual's residual functional capacity at Step Four, see Fargnoli v. Halter, 247 F.3d 34, 41 (3d Cir. 2001), and must consider limitations imposed by all of an individual's impairments, even those that are not "severe."  See SSR 96-8.  Such evidence includes medical records, lay evidence, effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment, descriptions of limitations by the Claimant and others, and observations of the Claimant's limitations by others.  Fargnoli, 247 F.3d at 41; see also SSR 96-9p.  Additionally, the ALJ's findings of residual functional capacity must "be accompanied by a clear and satisfactory explanation of the basis on which it rests."  Cotter, 642 F.2d at 704.

a.   Whether the ALJ Failed to Properly
     Evaluate And Weigh the Medical Evidence
     of Record

Claimant argues that the ALJ failed to give proper weight to the opinions of treating sources, Dr. Soloway and Dr. Dwyer, when determining her RFC, in accordance with 20 C.F.R. § 404.1527(d)(2).[19]  However, this Court finds that the ALJ gave the appropriate weight to both physicians medical findings in his determination of Claimant's credibility and RFC.  (R. at 19-20.) Moreover, the ALJ's findings regarding Claimant's RFC is consistent with, and supported by, Dr. Soloway's and Dr. Dwyer's medical findings for the relevant period of time.

The ALJ never suggested that he was giving less weight to the relevant evidence provided by Dr. Soloway and Dr. Dwyer. Instead, he thoroughly reviewed their reports and relied on them in his analysis.  The ALJ discussed a substantial number of Dr. Soloway's medical reports, and all of Dr. Dwyer's medical

---

[19] The relevant portion states, "Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations."  20 C.F.R. § 404.1527(d)(2).

39

reports, included in the record for the relevant time period. (R. at 19-20.)  While the ALJ did not discuss each one of Dr. Soloway's medical reports, the ALJ is not required to explicitly discuss every piece of evidence.  See Cotter v. Harris, 650 F.2d 481, 482 (3d Cir. 1981).  The ALJ did not disregard any material medical reports, therefore he adequately fulfilled his obligations pursuant to SSR 96-2p.

Furthermore, Dr. Soloway's findings during the relevant time period,[20] (R. at 243-257, 273-274), were consistent with Consultative Physician Khona's diagnosis of "fibromyalgia, chronic pain, patellofemoral arthropathy and generalized joint disease of the cervical and lumbar spines" with "only 'mild limitations' for bending and squatting due to knee pain."  (R. at 198.)  In November, 2005, Dr. Soloway reported that Claimant experienced improvement, though she was not one hundred percent recovered.  (R. at 245.)  In January, 2006, after an examination of Claimant, Dr. Soloway noted that Claimant was "doing well" on her current regimen.  (R. at 243.)  Dr. Dwyer's reports, which stated that Claimant suffered from continued patellofemoral

---

[20] The medical evidence on which Claimant relies, and which she argues supports the conclusion that she was disabled, are medical reports prepared before the relevant time period and not properly considered here beyond their historical background value.

symptomatology but did not have any additional detectable problems in her knee, further corroborated the reports and conclusions of Dr. Soloway and Dr. Khona.  (R. at 201.) Therefore, during the relevant time period, the reports of Soloway and Dr. Dwyer were consistent with the ALJ's determination of Claimant's RFC, and the ALJ gave proper weight to the medical findings in the reports of both physicians.

b.   The ALJ's Determination of Claimant's
     Residual Functional Capacity

Claimant contends that the ALJ did not satisfy the requirements imposed on the Commissioner by SSR 96-8p, because the opinion did not include a "function-by-function" assessment of the abilities listed in 20 C.F.R. § 404.1545 and did not adequately consider Claimant's psychological difficulties.  The Court cannot agree.  The ALJ opinion includes a narrative discussion of the evidence, medical and otherwise, showing that Claimant had a number of impairments including generalized degenerative joint disease of the cervical and lumbar spines, muscle spasms, fibromyalgia, patellofemoral arthropy and chronic pain, which "could reasonably be expected to produce the alleged symptoms."  (R. at 18-20.)

In light of reports by Treating Physicians Dr. Soloway and

Dr. Moore, Consultative Physician Khona[21] and State Agency Physician Skranovski, the ALJ concluded that "[C]laimant [had] the residual functional capacity to perform the full range of light work." (R. at 17.)  More specifically, the ALJ found Claimant was "able to lift/carry weights of ten pounds frequently and twenty pounds occasionally; stand and/or walk for a total of about six hours, in an eight hour work day; sit for a total of about six hours, in an eight hour work day; push and/or pull with both upper and lower extremities, without restriction; occasionally climb, balance, stoop, kneel, crouch and crawl." (Id.)  Thus, the ALJ properly performed a function-by-function analysis and this analysis was supported by substantial evidence.

The Court similarly rejects Claimant's argument that the ALJ did not sufficiently consider her mental health when determining her RFC.  The ALJ considered Claimant's mental impairments earlier in his opinion, and determined that they would not have more than a minimal effect on Claimant's ability to perform work related activities. (R. at 16-17.)  Though the ALJ made these finds at Step Two of his analysis, the Court will not require the ALJ to reconsider his RFC determination because he failed to

---

[21] Dr. Khona concluded that despite Claimant's impairments, Claimant had only "mild limitations" for bending and squatting because of her knee pain. (R. at 198.)

repeat the same analysis at Step Four.  Such a decision would unreasonably place form over substance.

Moreover, the ALJ's determination that Claimant's RFC was not impacted by her mental impairments is supported by substantial evidence.  The ALJ reviewed the findings of Dr. Moore and Dr. Skranovski, the only two doctors to present evidence of Claimant's psychological health.  Both doctors found that Claimant's mental impairments did not interfere with her ability to work.  The ALJ accurately paraphrased Dr. Moore's report, observing,

> . . . The claimant noted symptom improvement with medication . . . vocationally, the claimant appeared capable of understanding and following simple instructions and directions; performing simple and complex tasks with supervision and independently; maintaining attention and concentration for tasks; regular[ly] attend to a routine and maintain a schedule; learning new tasks; making appropriate decisions; and relate [sic] to and interact appropriately with others.

(R. at 17, 217-18.)  The report later stated that the "[r]esults of the examination appear to be consistent with psychiatric problems, but in itself this does not appear to be significant enough to interfere with the claimant's ability to function on a daily basis."  (R. at 217.)  Dr. Skranovski, the ALJ correctly noted, came to a similar conclusion.  (R. at 17.)  The ALJ observed that Dr. Skranovski concluded Claimant's affective

disorder "resulted in no limitations affecting activities of daily living, social functioning, concentration/persistence or pace, and no episodes of decompensation." (Id.)  Therefore, the ALJ properly performed the RFC analysis required of him, and moreover the result of that analysis is supported by substantial evidence.

          c.  Claimant's Ability to Perform Her Past
              Relevant Work

After the ALJ correctly determined that Claimant did not suffer from an impairment listed in 20 C.F.R. § 404.1520(d), the Commissioner considered whether Claimant retained the residual functional capacity to perform her past relevant work.  20 C.F.R. § 404.1520(d).  The Claimant bears the burden of demonstrating an inability to return to her past relevant work.  See Plummer v. Apfel, 186 F.3d 422, 428 (3d Cir. 1999).

Claimant's past positions as a cashier and teachers' aide are both light in exertional demands as performed in the national economy, according to The Dictionary of Occupational Titles.  DOT §§ 211.462-014, 099.327-010.  It is generally accepted that the "[u]se of the DOT at step four . . . is consistent with [the] test for determining . . . whether the claimant retains the capacity to perform the functional demands and job duties of the job as ordinarily required by employers throughout the national

economy." <u>Rivera v. Barnhart</u>, 239 F.Supp.2d 413 at 420 (D.Del. 2002); SSR 82-61.  Because Claimant's relevant work experience required light exertional demands, the ALJ properly determined that Claimant had the necessary RFC required for the light exertional demands of her past work as a cashier and teachers' aide.[22]

Claimant argues that the ALJ did not properly consider her mental impairments and the effects of stress pursuant to SSR 85-15 in his determination of Claimant's ability to perform past relevant work.  However, as was stated above, the ALJ previously found that Claimant's mental impairments, at most, minimally impacted her ability to perform work related activities.  (R. at 16-17.)  Because Claimant was deemed to be free of any significant mental impairments, the ALJ was right in concluding that she possessed the requisite abilities to perform work that was both skilled and semi-skilled in nature, as defined by The DOT.  (DOT §§ 211.462.014, 099.327-010).  Therefore, the ALJ's ultimate conclusion that Claimant's RFC permitted her to perform her past relevant work as it is generally performed in the

---

[22] Though the ALJ did not expressly state that Plaintiff could perform these functions on a regular and continuing basis, the RFC <u>is</u> "the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis," SSR 96-8p, and there was no need for the ALJ to make a separate finding.

national economy is supported by substantial evidence.

**III.   CONCLUSION**

For the reasons stated above, this Court finds that substantial evidence exists in the record to support the final decision of the Commissioner finding the Claimant to be not disabled as defined under the Social Security Act for purposes of eligibility for Disability Insurance Benefits.  The accompanying Order to affirm is entered.




**July 29, 2009**                               **S/ Jerome B. Simandle**
Date                                     Jerome B. Simandle
                                         U.S. District Judge